UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| KAREN STAMP<br>Plaintiff | : | |
| v. | : | Civil Action: 04-488L |
| METROPOLITAN LIFE INSURANCE COMPANY OF AMERICA AND MOBIL OIL CORPORATION | : | |

**AFFIDAVIT OF KAREN STAMP**

1. That I, Karen Stamp, am the wife of the late Stephen Stamp, and am the primary beneficiary relative to the claim(s) asserted for and including, but not limited to, Basic Life Insurance, Accidental Death & Dismemberment ("AD&D"), Basic Accidental Death & Dismemberment ("BAD&D"), and Occupational Accidental Death & Dismemberment ("VD&D") benefits under the above referenced Metropolitan Insurance Company of America ("MetLife")/Mobil Oil Corporation policy.

2. That I have personal knowledge of the facts contained herein.

3. At all pertinent times, my late husband, Stephen Stamp, was employed by Mobil Oil Corporation and was the designated policyholder and insured of group Basic Life Insurance, Accidental Death & Dismemberment ("AD&D"), Basic Accidental Death & Dismemberment ("BAD&D"), and Occupational Accidental Death & Dismemberment ("VD&D") policies issued to Mobil Oil Corporation, including the Life Insurance Plan of Mobil Oil Corporation and the Life Protection Insurance Plan of Mobil Oil Corporation,under which claims for benefits are processed by Metropolitan Life Insurance Company, and which the plan is administered by ExxonMobil delivered and governed by the laws of the Employees Retirement Income Security Act ("ERISA"), Group Policy No. 33313, 23200 and 27960.

4. The group policies issued to Mobil Oil Corporation including the Life Insurance Plan of Mobil Oil Corporation and the Life Protection Insurance Plan of Mobil Oil Corporation, delivered and governed by the laws of the Employees Retirement Income Security Act ("ERISA"), Group Policy No. 33313 23200 and 27960, provide Basic Life Insurance, Accidental Death & Dismemberment ("AD&D") in the amount of $188,000, Basic Accidental Death & Dismemberment ("BAD&D") in the amount of $426,000, and Occupational Accidental Death & Dismemberment ("OAD&D") in the amount of $171,000 in benefits to employees of Mobil Oil Corporation and their intended beneficiaries including, but not limited to, the plaintiff, Plaintiff, Karen Stamp.

5. That the facts forming the basis of the claim which I asserted and filed with Metropolitan Insurance Company of America ("MetLife"), and which was appealed to Exxon Mobil as plan fiduciary of the above insurance plans are accurately set forth in the attached affidavit which I submitted to Metropolitan Insurance Company of America ("MetLife"), and which was appealed to Exxon Mobil as plan fiduciary of the above insurance plans, which is attached hereto as Exhibit A.

Karen Stamp
Karen Stamp

Subscribed and sworn to before me this 14 day of April, 2006.

Fred Nelson Jr.

My Commission Expires 10/23/2006

IN RE

KAREN STAMP :
Plaintiff :
:
v. :
:
METROPOLITAN LIFE INSURANCE :
COMPANY OF AMERICA AND MOBIL :
OIL CORPORATION :

**AFFIDAVIT OF KAREN STAMP**

1. That I, Karen Stamp, am the wife of the late Stephen Stamp, and am the primary beneficiary relative to the claim(s) asserted for and including, but not limited to, Basic Life Insurance, Accidental Death & Dismemberment ("AD&D"), Basic Accidental Death & Dismemberment ("BAD&D"), and Occupational Accidental Death & Dismemberment ("VD&D") benefits under the above referenced Metropolitan Insurance Company of America ("MetLife")/Mobil Oil Corporation policy.

2. That I have personal knowledge of the facts contained herein.

3. That on or about August 2 and/or August 3, 2002, my late husband Stephen Stamp was employed by Exxon Mobil Chemical Company in Stratford, Connecticut, as Maintenance Manager.

4. My late husband Stephen Stamp first became employed by Exxon Mobil Chemical Company in Stratford, Connecticut in May, 2002.

5. His position as Maintenance Manager for Exxon Mobil Chemical Company in Stratford, Connecticut was supervisory in nature and was considered a management position.

6. Prior to Friday, August 2, 2002, Stephen and I discussed a mandatory meeting of certain Exxon Mobil Chemical Company employees, including Stephen, which was to take place in Westbrook, Connecticut.

7. A copy of the document provided to Stephen by Exxon Mobil Chemical Company concerning the "Stratford 2002 Exempt Meeting" of August 2, 2002 is attached hereto and made part hereof as Exhibit A.

8. A copy of Stephen's office day planner concerning directions to the mandatory meeting in Westbrook, Connecticut from our home in Litchfield, Connecticut, is attached hereto and made part thereof as Exhibit B.

9. A copy of a computer printout printed by Stephen concerning directions to the mandatory meeting in Westbrook, Connecticut from our home in Litchfield, Connecticut, is attached hereto and made part thereof as Exhibit C.

10. During the course of our discussions concerning this mandatory meeting which was to take place on Friday, August 2, 2002 in Westbrook, Connecticut, Stephen indicated that he "didn't want to go" to the meeting, especially since it was so geographically distant from our home in Litchfield Connecticut.

11. However as a management representative of Exxon Mobil Chemical Company, Stephen indicated that was required for him to attend the entire mandatory meeting in Westbrook, Connecticut. This was especially true since Stephen had only become recently employed as a management representative for Exxon Mobil Chemical Company, and top management personnel were going to attend the mandatory meeting.

12. A copy of the "Organizational Structure" of Exxon Mobil Chemical Company concerning Stephen and other employees in Stratford, Connecticut, is attached hereto and a part hereof as Exhibit D.

13. Additionally, Stephen and I had previously made plans that he would stay at his parents' home in his hometown of Johnston, Rhode Island that evening since we were to attend a family gathering on Saturday, August 3, 2002, for his brother's 40th birthday. This was an additional reason that he preferred not to attend the mandatory meeting which was to take place on Friday, August 2, 2002 in Westbrook, Connecticut. Steven also indicated that he preferred not to attend this mandatory meeting since it would have been preferable to drive from our home in Litchfield, Connecticut to Johnston, Rhode Island on the afternoon of Friday, August 2, 2002.

14. However, since the meeting on Friday, August 2, 2002 in Westbrook, Connecticut.was mandatory, Stephen and I made plans concerning both of us attending the family gathering in Rhode Island on Saturday, August 3, 2002, for his brother's 40th birthday.

15. The plans which we made involved Stephen agreeing to drive directly from the meeting in Westbrook, Connecticut at the completion of the meeting on the evening of Friday, August 2, 2002.

16. The reason that we made this plan was that it would be easier and more convenient both from a time and geographical standpoint that Stephen drive directly from the meeting in Westbrook Connecticut late that evening to Johnston, Rhode Island, as opposed to returning to our home in Litchfield Connecticut.

17. According to our plans, I was to drive directly from our home in Litchfield Connecticut with our daughter to meet Stephen at his parents' home in Johnston, Rhode Island on the morning of Saturday, August 3, 2003.

18. Stephen left our home in Litchfield, Connecticut left around at 6:00 a.m. on the morning of Friday, August 2, 2002 since he anticipated a lengthy drive to the mandatory meeting in Westbrook, Connecticut which started at about 7:45 a.m. This was as Exxon Mobil Chemical Company did not provide transportation to its employees from the Stratford, Connecticut facility to the meeting in Westbrook, Connecticut.

19. Stephen telephoned me at home at approximately 5:20 P.M. on Friday, August 2, 2002, at which time we discussed the events of the mandatory meeting in Westbrook, Connecticut. Stephen sounded in good spirits, and indicated that he had had a "good day" during the day-long meeting. He said that the weather had been "great", and that he enjoyed the boat cruise, during which lunch and beer was provided by Exxon Mobil Chemical Company to its employees.

20. Stephen indicated that he was in the process of changing his clothes to attend the business dinner, at which management and supervisory personnel were expected to attend, at a hotel across the street from where the boat had docked. Stephen and I also confirmed our previous plans that he would stay at his parents' home in his hometown of Johnston, Rhode Island that evening since we were to attend a family gathering on Saturday, August 3, 2002, for his brother's 40th birthday

21. At no time during our telephone discussion on Friday, August 2, 2002 did Stephen seem impaired; to the contrary, he sounded in good spirits, and indicated that he had had a "good day" during the day-long meeting.

22. Although I did not speak with Stephen after that telephone discussion, it is my understanding in reviewing his Exxon Mobil Chemical Company cellular telephone records, which is attached hereto and made part thereof as Exhibit E, that Stephen made several telephone calls to friends in Rhode Island after the meeting of Friday, August 2, 2002 ended between 8:30 and 9:00 P.M.

23. It is my understanding that Stephen spoke with his friend, Joe Kingsley, at about 9:30 P.M. for about 10 minutes, at which time Stephen apparently discussed meeting Joe on his way to his parents' home in Johnston, Rhode Island. It is also my understanding that Stephen sounded in good spirits and did not seem impaired in his telephone conversation with Joe Kingsley.

24. I have had the opportunity to review the correspondence of March 11, 2004 of Exxon Mobil Chemical concerning the events of August 2, 2002. As to the boat cruise which took place in the afternoon of August 2, 2002, in reviewing the "Organizational Structure" of Exxon Mobil Chemical Company concerning Stephen and other employees in Stratford, Connecticut, it is apparent that the majority attending this company sponsored event were either management or supervisory personnel of Exxon Mobil Chemical Company.

25. Additionally, in reviewing the "Organizational Structure" of Exxon Mobil Chemical Company, it is also apparent that those who attended the business dinner on the evening of August 2, 2002 were either management or supervisory personnel of Exxon Mobil Chemical Company. For example, Stephen apparently sat with Robert Migliorini, his immediate supervisor and Plant Manager, Gerry Smerka, Operations Manager, Dave Liestman, Technical Manager, B.J. Welch, Training Supervisor, and Rick Turner, EIT Coordinator.

26. Finally, as to the response of Exxon Mobil Chemical Company as to the issue of "What was Mr. Stamp's condition when he left? (the business dinner)", which confirms that Stephen "showed no signs of impairment" at the time that he left, and that "Mr. Stamp's speech was normal and his thoughts seemed coherent", these comments and observations are consistent with my perception of Stephen's condition when I last spoke with him at approximately 5:20 P.M. on Friday, August 2, 2002, at which time we discussed the events of the mandatory meeting in Westbrook, Connecticut, and are also consistent with that of Stephen's later telephone conversation with Joe Kingsley.

Karen Stamp

Subscribed and sworn to before me this 20th day of May, 2004.

Fred Nelson Jr.