UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


KAREN STAMP,                        )
          Plaintiff,                )
                                    )
                                    )
v.                                  )        C.A. No. 04-488L
                                    )
                                    )
METROPOLITAN LIFE                   )
INSURANCE COMPANY;                  )
ADMINISTRATOR-BENEFITS,             )
EXXON MOBIL BENEFIT PLAN;           )
EXXON MOBIL BENEFIT PLAN;           )
EXXON MOBIL CORPORATION;            )
LIFE INSURANCE PROTECTION           )
PLAN of MOBIL OIL CORPORATION;      )
and LIFE INSURANCE PLAN of MOBIL    )
OIL,                                )
          Defendants.               )


<u>MEMORANDUM AND ORDER</u>


Ronald R. Lagueux, Senior United States District Judge.

     This matter is before the Court on cross-motions for summary judgment made pursuant to Federal Rule of Civil Procedure 56(b). On one side, Defendants Metropolitan Life Insurance Company ("MetLife"), Administrator-Benefits, Exxon Mobil Benefit Plan, Exxon Mobil Benefit Plan, Exxon Mobil Corporation, Life Insurance Protection Plan of Mobil Oil Corporation, Life Insurance Plan of Mobil Oil[1] (collectively, "Mobil") jointly move for summary

---

[1]There was some confusion regarding the proper names of the Defendant corporate entities in the parties' papers.  The Court will use the names and spelling offered by Defendants in their Memorandum in Support of Defendants'

judgment.  On the other side, Plaintiff Karen Stamp
simultaneously objects to Defendants' Motion and moves for
summary judgment.  While Mobil and MetLife moved jointly for
summary judgment, the two groups of Defendants submitted separate
exhibits to support their Motion, each consisting of their
respective claim files and the affidavit of the administrator of
the claim.[2]  The Court heard oral arguments on May 9, 2006, and
took the matter under advisement.  This case is now in order for
decision.  For the reasons that follow, the Court grants
Defendants' Motion for Summary Judgment and denies Plaintiff's
Cross-Motion for Summary Judgment.


I.   Facts

     The following facts are undisputed by the parties.  On
August 2, 2002, the late Stephen Stamp, husband to Plaintiff
Karen Stamp, attended an employee meeting at a resort in
Westbrook, Connecticut.  Mr. Stamp was then employed by Exxon
Mobil Chemical Company, a division of Exxon Mobil Corporation, as
a maintenance manager in Connecticut where he lived.  The meeting

_____

Joint Motion for Summary Judgment.

     [2]Mobil's exhibits are headed by the affidavit of Douglas F. Garrison,
the Plan Administrator.  MetLife's exhibits are headed by the affidavit of
Thomas F. Presite, the Claim Examiner for MetLife.  When citing to the
different claim files, the Court will refer to the two sets of exhibits by the
party offering them.  Since MetLife's exhibits have a pagination system and
those of Mobil do not, the Court will refer to the documents in MetLife's
exhibits by page number and to those in Mobil's exhibits by broader
description.

consisted of presentations in the morning and a boat cruise in the afternoon, followed by dinner that evening.  By all accounts, Mr. Stamp attended every part of the company meeting and consumed several alcoholic beverages during the boat cruise and dinner. Mr. Stamp spoke with his wife at 5:20 p.m. that evening, before the dinner, and she attests that he did not sound impaired to her, that he "sounded in good spirits," and that he had enjoyed the meeting and cruise.  (Mobil Ex. E, Karen Stamp Aff. ¶ 21.) During their conversation, the Stamps also confirmed their earlier-made plans for Mr. Stamp to drive to Johnston, Rhode Island from the meeting in Connecticut and stay at his parents' home, where his wife and young daughter would join him to celebrate his brother's 40th birthday party the next day.

After speaking with his wife, Mr. Stamp attended the company dinner and then joined a few co-workers at the hotel bar.  Those co-workers reported that Mr. Stamp left the hotel between 8:30 and 9:00 p.m., that he did not seem impaired or unsteady, and that his speech and thoughts seemed coherent when he got in his car to drive to Rhode Island.  Mr. Stamp's cell phone records reveal that he made several phone calls after having left the hotel.  At 9:20, Mr. Stamp phoned a friend who lived in Rhode Island, Joe Kingsley, and spoke with him for about 9 minutes. Mr. Kingsley recounts that the two spoke about possibly meeting, but Mr. Kingsley demurred on account of an early work start the

next morning.  Mr. Kingsley also describes Mr. Stamp's mood as
positive and upbeat and attests that he did not seem intoxicated.

According to the police report, Mr. Stamp was in a one-car
collision at approximately midnight when his car went off the
road in Johnston, Rhode Island.  The police report describes the
incident as occurring when Mr. Stamp, while traveling north on
Route 295, "lost control" and "exited the left side of the
roadway briefly causing [his vehicle] to skid across the second
and first lanes of travel." (MetLife Ex. D at 146.)  The car then
exited the right side of the roadway, rotated 180 degrees, and
struck a tree.  Mr. Stamp was pronounced dead on the scene at
12:07 a.m.  The police report describes the road condition at the
time of the collision as dry, the traffic condition as light and
there were no adverse weather conditions.

The autopsy report prepared by the Rhode Island Office of
Medical Examiners concluded that the cause of death was
"[m]ultiple injuries due to blunt force trauma." (MetLife Ex. D
at 138.)  The report also noted "acute ethanol intoxication" as
another significant finding.  (Id.)  The toxicology report
prepared by the same office found Mr. Stamp's postmortem heart
blood ethanol level was 265 mg/dl, which can also be expressed as
a 0.265% blood alcohol level.

In a communication to MetLife's Group Claims Division dated
January 9, 2003, MetLife's Medical Department opined that Mr.

4

Stamp's level of intoxication "would cause delirium intoxication. In a sporadic drinker it would cause lethargy, stupor, combativeness, incoherency and vomiting.  In a chronic drinker there would be mild emotional changes and motor changes." (MetLife Ex. D at 119.)

Defendants posit that Mr. Stamp must have stopped somewhere on the way to his parents' house that night and consumed more alcohol, given the reports of his unimpaired motor and verbal skills when he left the hotel bar and the ultimate finding of blood alcohol level in the toxicology report.  Defendants also point to the fact that the Medical Examiner noted a stamp on the back of Mr. Stamp's hand that said "copy," (MetLife Ex. D at 134) as well as to the lapse of time between his departure from the hotel and the tragic event in Johnston.  Because the blood alcohol level found by the Medical Examiner is unequivocal evidence of Mr. Stamp's intoxication at the time of death, the question of whether he stopped at a bar is not a material factual dispute, and the Court need not speculate as to its truth.

Mr. Stamp, as an employee of Exxon Mobil Chemical Company, was at all relevant times a participant in Mobil's employee welfare benefit plan ("the Plan"), which provided various accidental death and dismemberment ("AD&D") benefits.  Mr. Stamp designated Karen Stamp as his primary beneficiary.  The focus of this litigation is the AD&D group policies issued to Mr. Stamp by

Mobil, namely, Basic AD&D, Voluntary AD&D, and Occupational AD&D, the relevant terms of which follow.

**1.  Basic AD&D**

Basic AD&D coverage was part of a package that included Basic Life Insurance.  The life insurance benefits were paid to Mrs. Stamp in September 2002.  The package was optional, and the participant was to pay $0.15 per month per $1,000 of coverage over $50,000, while Mobil paid the balance of the premium.  Benefits were funded by MetLife group policy 23200-G.  The amount that would have been payable to Mrs. Stamp for the AD&D portion of this policy is $188,000.

The operative Summary Plan Description ("SPD") states that "[i]f you are physically injured as a result of an accident and die within 90 days as a result of that injury or accident, your designated beneficiary will receive the full amount of your accidental death and dismemberment benefit as well as your normal benefit under Basic Life Insurance . . ." (Mobil Ex. A, Mobil Chemical Films Division April 1997 SPD ("1997 SPD") at 81.)  The policy lists under the heading "Exceptions," "death or loss caused by . . . intentional self-destruction or intentionally self-inflicted injury." (Id.)

**2.  Voluntary AD&D**

Voluntary AD&D, as its name suggests, must be elected by the participating employee, and the employee pays the entire cost of

6

the coverage.  The cost to the participating employee is $0.03 for each $1,000 of coverage per month.  Benefits are funded by MetLife group policy no. 27960-G.

The terms of the Voluntary AD&D coverage, as expressed in the Summary Plan Description, incorporate the conditions for payment in the Basic AD&D policy, and thereby require an "accidental death." (MetLife Ex. D at 165.)  This policy also excepts payment in cases of "intentionally self-inflicted injury" or "committing or attempting to commit a felony or other serious crime or an assault."  (Id.)  The amount that would have been payable to Mrs. Stamp from this policy is $426,000.

3.  **Occupational AD&D**

Occupational AD&D coverage is automatic upon employment, and is at no cost to the employee.  Benefits are funded by MetLife group policy no. 33313-G.  The terms of the policy state that benefits will be paid if "you are injured in an Occupational Accident . . . and if, (a) that Occupational Accident is the sole cause of the injury; and (b) that injury is the sole cause of that death; and (c) that death occurs not more than one year after the date of that Occupational Accident." (MetLife Ex. C at 109.)  The plan then defines "Occupational Accident" as one which "happens in the course of any work performed 'while at work' for the Employer . . ." (Id. at 103-04.)

The plan will not pay death benefits if the death "in any

7

way results from, or is caused or contributed by: . . . injuring oneself on purpose; or . . . committing or trying to commit a felony or other serious crime or an assault . . . ."  (*Id.* at 109-10.)  The amount that would have been payable to Mrs. Stamp from this policy is $171,000.

At all relevant times, Mobil administered claims submitted under the Plan and acted as a fiduciary of the Plan.  MetLife was also a claims fiduciary of the Plan and administered certain claims under the Plan.  Mobil was the Plan Administrator at all relevant times, and as such, had "full and exclusive authority to make final determinations as to *all* issues concerning plan administration . . . ."  (Mobil Ex. B, 1997 SPD at 74.)

On August 20, 2002, Mrs. Stamp submitted to MetLife a claim for Basic, Voluntary, and Occupational AD&D benefits under the Plan.  MetLife paid the claim for Basic Life Insurance benefits in September 2002.  MetLife denied the claims for Basic and Voluntary AD&D benefits on March 26, 2003, but left undetermined Mrs. Stamp's claim for Occupational AD&D benefits.  Mrs. Stamp submitted a timely appeal of MetLife's denial to Mobil on July 20, 2004.  On October 15, 2004, Mobil denied the appeal of MetLife's Basic and Voluntary AD&D denials, and rejected the claim for Occupational AD&D benefits.  Mobil concluded that Mr. Stamp's death was not an "accident" for purposes of the Basic, Voluntary and Occupational AD&D policies, that his death was

excluded from coverage by the Basic and Voluntary plans because it was caused by "intentionally self-inflicted injury," and that it did not occur "while at work" for purposes of the Occupational AD&D policy.  Moreover, Mobil asserted that Mr. Stamp was committing a serious crime within the meaning of the Voluntary and Occupational AD&D plans, and was thereby excluded from payment of benefits.

Plaintiff initially filed her Complaint in this Court on November 18, 2004.  In the First Amended Complaint, Plaintiff asserted claims of (I) breach of contract, alleging Metlife and Mobil unreasonably denied her claim; and (II) "breach of fiduciary responsibility," alleging MetLife and Mobil owed Karen Stamp, as the intended beneficiary of the insurance policies at issue here, a fiduciary duty, which they breached.

## II.  Standard of Review

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Cross-motions for summary judgment on undisputed facts require a court to determine whether either of the parties deserves judgment as a matter of law.  Littlefield v. Acadia Ins.

Co., 392 F.3d 1, 6 (1st Cir. 2004)(citing Barnes v. Fleet Nat'l
Bank, N.A., 370 F.3d 164, 170 (1st Cir. 2004)).  Similarly, in
the context of a suit arising under the Employee Retirement
Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461
(2006), the traditional summary judgment practice of drawing
inferences in favor of the nonmoving party is suspended where
certain criteria are met, such as where review is based only on
an agreed-upon administrative record, review is an ultimate
conclusion as to disability, and there is no dispute over plan
interpretation.  Orndorf v. Paul Revere Life Ins. Co., 404 F.3d
510, 517 (1st Cir. 2005).  Because there is indeed a dispute over
plan interpretation in this case, the Court will not suspend
summary judgment procedure as in Orndorf, but will treat the
cross-motions for summary judgment on undisputed facts as a "case
stated" according to Littlefield.

     As discussed more fully below, this is an ERISA enforcement
action pursuant to 29 U.S.C. § 1132(a)(1)(B).  A plan
administrator's denial of benefits in the ERISA context is
reviewed for abuse of discretion where the plan administrator has
been expressly granted discretionary authority to determine
benefit eligibility or to construe the terms of the plan.
Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110-11
(1989).  In the ERISA context, in the First Circuit, the "abuse
of discretion" standard functions as the equivalent of the

10

"arbitrary and capricious" standard. Wright v. R. R. Donnelley &
Sons Co. Group Benefits Plan, 402 F.3d 67, 74 n.3 (1st Cir.
2005).   Here, there is no dispute that Mobil was expressly
granted this discretionary authority by the terms of the Plan,
and therefore, the Court reviews Defendants' denial of benefits
under the "arbitrary and capricious" standard.

Plaintiff nonetheless urges the Court to adopt a de novo
standard of review because Mobil's contract with MetLife is
"experience-rated," meaning that Mobil's premium costs are
affected by the number and size of claims presented, and that
because of this, Mobil was biased in its determination of Mrs.
Stamp's claim by its interest in keeping its premiums low.   The
First Circuit has repeatedly rejected a stronger version of this
"structural conflict of interest" argument, insisting that even
where the insurer is the decisionmaker on a benefits claim, its
self-interest does not mandate a less deferential standard.   See,
e.g., Wright, 402 F.3d at 75 (listing cases).   Because the self-
interest created by an "experience-rated" contract does not rise
to the level of conflict of interest, the "arbitrary and
capricious" standard of review is appropriate for the Court to
utilize when reviewing the plan administrator's decision in this
case.

The "arbitrary and capricious" standard in ERISA review
cases means that a plan administrator's decision will be upheld

11

if it was within the administrator's authority, reasoned, and supported by substantial evidence in the record. Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998). Substantial evidence is "evidence reasonably sufficient to support a conclusion." Id.

## III. Discussion

Neither side disputes that the plans at issue qualify as "employee welfare benefit plans" under 29 U.S.C. § 1002(1) and that, therefore, the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461 (2006) applies to this case. While Plaintiff appears to assert state law breach of contract and breach of fiduciary duty claims in her Complaint, she nonetheless obviously brings the action under ERISA and seeks the recovery of benefits under the plans issued to her late husband.

The civil enforcement provisions of ERISA allow a plan participant or beneficiary to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . ." 29 U.S.C. § 1132(a)(1)(B). These provisions were meant to preempt state laws that "relate to" an ERISA plan, 29 U.S.C. § 1144(a), and any alternative enforcement mechanism that purports to remedy the

12

violation of a right guaranteed by ERISA, <u>Carpenters Local Union No. 26 v. U.S. Fid. & Guar. Co.</u>, 215 F.3d 136, 141 (1st Cir. 2000). This Court has previously concluded that, under the "powerful preemptive sweep" that Congress intended ERISA to effect, <u>Morris v. Highmark Life Ins. Co.</u>, 255 F. Supp. 2d 16, 20 (D.R.I. 2003)(<u>quoting Danca v. Private Health Care Systems, Inc.</u>, 185 F.3d 1, 4 (1st Cir. 1999)), state law suits alleging breach of contract are preempted by the enforcement actions articulated in ERISA, 255 F. Supp. 2d at 27. In this case, Plaintiff has offered nothing to differentiate her contract claim from an ordinary request for benefits under the Mobil Plan, and her state contract claim is therefore preempted under ERISA.

ERISA does allow beneficiaries to sue a plan for breach of fiduciary duty causing individual harm. <u>Varity Corp. v. Howe</u>, 516 U.S. 489, 515 (1996). However, the Court in <u>Varity</u> specified that such suits were only appropriate for equitable relief, and then only where Congress has failed to provide adequate, more specific relief. <u>Id.</u> In this case, the adequate, more specific relief is payment of benefits, which bars a further remedy under the "catch-all" provision of 29 U.S.C. § 1132(a)(3), where fiduciary duty claims find their authority. <u>Massey v. Stanley-Bostitch, Inc.</u>, 255 F. Supp. 2d 7, 14 (D.R.I. 2003); <u>King v. UNUM Life Ins. Co. of Am.</u>, 221 F. Supp. 2d 1, 4 (D. Me. 2002). Furthermore, to the extent Plaintiff asserts a common law breach

of fiduciary duty claim, that claim is preempted by ERISA.  <u>See</u>
<u>Nash v. Trustees of Boston Univ.</u>, 946 F.2d 960, 964 n.8 (1st Cir.
1991)(<u>citing</u> <u>Pilot Life Ins. Co. v. Dedeaux</u>, 481 U.S. 41, 54
(1987).

Therefore, because Plaintiff seeks the payment of plan
benefits, the Court opines that the only appropriate cause of
action in this case is a claim for enforcement of the ERISA plan
pursuant to 29 U.S.C. § 1132(a)(1)(B).

Both MetLife and Mobil based their denial of benefits, in
the initial denial letter as well as in the denial on appeal, on
interpretations of the terms "accident," "intentionally self-
inflicted," "serious crime" and "while at work," as used in the
separate AD&D policies.  The plans did not define the terms
"accident," "intentionally self-inflicted," or "serious crime,"
but did provide some clarification of the phrase "while at work."

If the language of an ERISA insurance policy is clear and
unambiguous, then the language must be given its natural meaning.
<u>Burnham v. Guardian Life Ins. Co. of Am.</u>, 873 F.2d 486, 489 (1st
Cir. 1989).  As other courts have found in interpreting policies
similar to those at issue here, the term "accident" is nothing
but ambiguous.  Mr. Justice Cardozo famously called misguided
attempts to define it akin to plunging in a "Serbonian Bog."
<u>Landress v. Phoenix Mut. Life Ins. Co.</u>, 291 U.S. 491, 499
(1934)(Cardozo, J., dissenting).  Other courts have described the

14

question as "one of the more philosophically complex simple questions" in the law, Fegan v. State Mut. Life Assurance Co., 945 F. Supp. 396, 399 (D.N.H. 1996), or simply a "metaphysical conundrum[,]" Wickman v. Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1084 (1st Cir. 1990). The terms "intentionally self-inflicted," "serious crime," and "while at work" also lend themselves to more than one reasonable definition, and are therefore ambiguous as well.

The ambiguity of these contract terms precludes a "plain and ordinary meaning" interpretation of the contract and directs the Court to the federal common law that governs interpretation of an ERISA insurance plan. Pilot Life, 481 U.S. at 56. The federal common law of ERISA contract interpretation has incorporated state law principles as a way of accessing "common-sense canons of contract interpretation." Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 585 (1st Cir. 1993)(citing Bellino v. Schlumberger Technologies, Inc., 944 F.2d 26, 29 (1st Cir. 1991)). Courts are directed to construe insurance contracts liberally "in order to afford the protection which the insured was endeavoring to secure when he applied for the insurance." Wickman, 908 F.2d at 1084 (citations omitted). Nevertheless, "courts have no right to torture language in an attempt to force particular results or to convey delitescent nuances the contracting parties neither intended nor imagined." Burnham, 873

15

F.2d at 489.

**What is an "accident"?**

In the initial denial letter to Mrs. Stamp, MetLife

explained why benefits could not be paid from the Basic and

Voluntary AD&D policies in these terms:

> In the State of Rhode Island, a person is considered
> legally intoxicated and incapable of operating a motor
> vehicle if the blood alcohol level is .08 percent or
> higher.  This is because alcohol impairs the drinker's
> judgment and physical and mental reactions.  Here, Mr.
> Stamp's blood alcohol level was over 3 times the legal
> limit.  The mental and physical impairments caused by
> excessive alcohol consumption are intentionally self-
> inflicted injuries that caused the death.  In addition,
> the act of driving while so impaired rendered the
> infliction of serious injury or death reasonably
> foreseeable and hence not accidental as contemplated by
> the plan.

(MetLife Ex. D at 62.)  In its denial of the subsequent appeal,

Mobil offered a more elaborate explanation:

> Neither the SPD nor the underlying insurance policy
> defines the term "accident," and I am called upon to
> interpret that term.
> In your appeal submission you argue that the
> weight of legal authority compels me to find that the
> collision in this case was an "accident" within the
> meaning of the plan.  Counsel has reviewed these and
> other cases and advises that the weight of authority
> under applicable Federal law would not compel such a
> finding.
> Inasmuch as I am not bound by law, I look to the
> purpose of the plan.  I believe that the purpose of the
> plan is to protect participants from risks that are
> outside of their control.  The risks flowing from
> driving while intoxicated are completely within the
> control of the participant.  While it is true that
> certain behavior that increases risk (such as skiing or
> horseback riding) would not result in loss of coverage,
> [driving while intoxicated] can be distinguished
> because it unreasonably increases the risk associated

16

> with a normally safe activity by interfering with an
> individual's ability to perceive and respond to risk.
> To impose the costs of such unreasonable risk-taking on
> the plan would result in unanticipated cost.

(Mobil Ex. B, Letter of October 15, 2004 at 2.)  From these
explanations, the Court understands that MetLife defines
"accident" as an outcome that is not "reasonably foreseeable."
Mobil's explanation seems to broaden the concept of "accident" to
something that results from normally safe activity or even
reasonable risk-taking behavior (such as skiing or horseback
riding) but not something resulting from behavior, completely
within the control of the insured, that unreasonably increases
the risk involved in an activity.  The Court's task in this case
is to determine whether these definitions are reasonable as
applied to Mr. Stamp's case.

The equation of "reasonably foreseeable" with "not
accidental" that MetLife espoused in its denial was eschewed by
the First Circuit in Wickman v. Northwestern Nat'l Ins. Co., 908
F.2d 1077, 1088 (1st Cir. 1990).  In that case, the First Circuit
replaced a "reasonably foreseeable" test with a three-prong
analysis designed to aid courts in determining whether a death
was accidental within the meaning of ERISA-qualified AD&D
policies.  The first prong asks a court to consider "the
reasonable expectations of the insured when the policy was
purchased."  Wickman 908 F.2d at 1088.  If the court determines

17

that the insured did not expect an injury of the kind he suffered, the court must examine whether the suppositions underlying his expectations were reasonable, allowing for the personal characteristics and experiences of the insured.   Id. Finally, if the court cannot determine the insured's subjective expectation, it must ask "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct."   Id.

This Court recently applied the Wickman analysis in a case strikingly similar to the one at bar.   In Mullaney v. Aetna U.S. Healthcare, 103 F. Supp. 2d 486 (D.R.I. 2000), the beneficiary of an AD&D policy sought to recover benefits which had been denied her after her husband died in a single-car collision.   The insured husband was found to have a blood alcohol level of 0.370% at the time of his death.   His accidental death insurance policy similarly did not define the term "accident," and did not expressly exclude alcohol-related injuries.   This Court concluded that, given the insured's extreme level of intoxication and the excessive speed of his driving, his death could not be an accident under Wickman.   This writer reasoned that "[e]ven if Mr. Mullaney himself may not have intended or foreseen any harm in attempting to drive while grossly intoxicated, a reasonable person surely would have known that such conduct would likely

18

result in serious bodily harm or death." Id. at 494.

Outside of this Circuit, there is a split in authorities on whether death from driving while intoxicated can be considered an accident under ERISA federal common law. Plaintiff offers several recent cases applying Wickman that find death as a result of driving while intoxicated to be accidental. One of the arguments asserted by those courts is that statistical evidence shows that the number of drunk driving deaths constitutes less than one percent of the number of people arrested for drunk driving, and that, therefore, a person is much more likely to be arrested while driving drunk than to be killed. See King ex. rel. Schanus v. Hartford Life and Accident Ins. Co., 357 F.3d 840, 844 (8th Cir. 2004) rev'd en banc on other grounds, 414 F.3d 994 (8th Cir. 2005); Lennon v. Metro. Life Ins. Co., 446 F. Supp. 2d 745, 751 (E.D. Mich. 2006); Eckelberry v. Reliastar Life Ins. Co., 402 F. Supp. 2d 704, 712 (S.D. W. Va. 2005) rev'd, --- F.3d --- , 2006 WL 3333747 (4th Cir. 2006); West v. Aetna Life Ins. Co., 171 F. Supp. 2d 856, 903-04 (N.D. Iowa 2001). These courts reason further that, assuming more people drive while intoxicated than are arrested for it, these statistics show a person is even more likely to arrive home uninjured than be either arrested, injured, or killed.

Mark Twain famously quipped that "there are three kinds of

lies: lies, damn lies, and statistics."[3]  The statistics cited by
the courts above are meaningless in this context.  They do not
consider the characteristics of the driver, the type of road
involved, the length of the fatal drive, how long the driver had
been intoxicated, and most importantly, the degree of his
intoxication.  These factors appear to the Court to be crucial to
a determination of whether the driver was so intoxicated as to
make a fatal collision highly likely.

Defendants, in turn, cite to the courts who find the
converse, namely, that deaths resulting from driving while
intoxicated are not accidents.  See Cozzie v. Metro. Life Ins.
Co., 140 F.3d 1104, 1110 (7th Cir. 1998);  Poeppel v. Hartford
Life Ins. Co., 273 F. Supp. 2d 714, 720 (D.S.C. 2003); Sorrells
v. Sun Life Assurance Co. Of Can., 85 F. Supp. 2d 1221, 1233-34
(S.D. Ala. 2000); Schultz v. Metro. Life Ins. Co., 994 F. Supp.
1419, 1422 (M.D. Fla. 1997); Nelson v. Sun Life Assurance Co. of
Canada, 962 F. Supp. 1010, 1012 (W.D. Mich. 1997); Walker v.
Metro. Life Ins. Co., 24 F. Supp. 2d 775, 781 (E.D. Mich. 1997);
Fowler v. Metro. Life Ins. Co., 938 F. Supp. 476, 480 (W.D. Tenn.
1996); Cates v. Metro. Life Ins. Co., 14 F. Supp. 2d 1024, 1027
(E.D. Tenn. 1996), aff'd, 149 F.3d 1182 (6th Cir. 1998).  These
courts avoid statistical analyses of likelihood as a basis for

---

[3]In his autobiography, Twain attributes the phrase to Benjamin Disraeli,
but Disraeli scholars dispute that the English Prime Minister ever wrote or
spoke the phrase, so the Twain attribution stands.

determining whether death from driving while intoxicated is accidental; rather, they focus on the well-publicized nature of the dangers of driving while intoxicated and the logical connection between driving while impaired and serious injury. See, e.g., Sorrells, 85 F. Supp. 2d at 1233; Schultz, 994 F. Supp. At 1422.

It is worth noting that several of the cases cited by Defendants do not apply the Wickman test and affirm an insurer's use of the "reasonably foreseeable" test for "accident." See, e.g., Cozzie, 140 F.3d at 1109-10; Cates, 14 F. Supp. 2d at 1027; Sorrells, 85 F. Supp. 2d at 1235. This Court, by contrast, is bound to follow Wickman and its interpretation in this Circuit to settle the question of whether Defendants' interpretation of the policy term "accident" is reasonable.

The first step of the Wickman analysis requires a court to attempt to ascertain the insured's actual expectations at the time he enrolled in the group policies, and whether he expected an injury similar to the one he suffered. 908 F.2d at 1088. This Court has no way of knowing, and no evidence has been adduced concerning, what Mr. Stamp's state of mind was at the time he signed up for the AD&D policies with regard to this kind of eventuality. While it appears from reports of conversations with his wife and friends the night of the accident that Mr. Stamp did not expect to die in a car collision, but rather

expected to make it to his parents' house safely, the evidence is nonetheless insufficient to determine accurately the insured's subjective expectation.  Therefore, the Court does not reach the second prong of the analysis, requiring it to determine whether the assumptions underlying Mr. Stamp's expectations were reasonable.  Id. at 1088.

Wickman instructs that the final question the court must ask is "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct."  Id.  This objective portion of the Wickman test replaces "reasonably foreseeable" with "highly likely" as the determining characteristic of non-accidents.

The Court concludes that while death as a result of driving while intoxicated is not, as a matter of law, non-accidental, in this case, Mr. Stamp's blood alcohol level was so elevated that the intentional conduct of operating his car while so intoxicated was highly likely to result in the injury he did suffer.  While it may be true that an intoxicated driver is more likely to arrive safely at home than to be arrested or injured, when compared with a sober driver, the highly intoxicated driver is many times more likely to be fatally injured.  A driver who is over three times the legal limit of blood alcohol level, as Mr. Stamp was, is so impaired that, in this Court's view, he is

22

likely to "pass out" or "black out" and cause a fatal collision
to occur. As MetLife's Medical Department offered, Mr. Stamp's
level of intoxication would cause in a sporadic drinker
"lethargy, stupor, combativeness, incoherency and vomiting."
(MetLife Ex. D at 119.) No evidence has been produced to show
Mr. Stamp was anything more than a sporadic drinker, and
therefore, the effects of the alcohol on him were likely those
described by the MetLife Medical Department. Thus, while Mr.
Stamp may have had every expectation of arriving at his parents'
home safely, a reasonable person of similar background and
characteristics would have viewed Mr. Stamp's conduct as highly
likely to result in a fatal injury. For this reason, Defendants'
determination that Mr. Stamp's death was not accidental is
reasonable and supported by substantial evidence in the record.

Plaintiff argues that there is no evidence that Mr. Stamp's
intoxication actually caused the accident, and that therefore,
Defendants may not base the exclusion of Mr. Stamp's death from
coverage on his blood alcohol level. However, the policies at
issue have no strict causation requirement; they merely require
that the insured be "physically injured as a result of an
accident." (Mobil Ex. A, 1997 SPD at 81.) Moreover, all
indications point to Mr. Stamp's intoxication as the cause of his
collision: there was light traffic and the road was dry at the
time of the crash, there were no adverse road conditions, and no

23

other car was involved in the wreck.  Plaintiff speculates a
steering failure or a blowout may have caused Mr. Stamp to crash,
and offers that he may have been avoiding another car or an
animal running across the road.  No evidence has been submitted
that would even suggest these alternative explanations, and the
Court has no reason to conclude that anything but Mr. Stamp's
intoxication caused the collision.

The Basic and Voluntary AD&D policies at issue in this case
contain an exclusion for injuries that are "intentionally self-
inflicted."  The Voluntary and Occupational AD&D policies exclude
death or injuries sustained while committing or attempting to
commit a felony or other serious crime, or an assault.  Moreover,
the Occupational AD&D policy requires that the accident occur
"while at work."  Ultimately, these exclusions and narrowed
coverage need not be interpreted by this Court.  Because all
three policies require that a death must be the result of an
"accident," and this Court has determined that Defendants' denial
of coverage based on the non-accidental nature of the insured's
death from driving while severely intoxicated was reasonable,
there is no need to reach those issues.


                    IV.  Conclusion

For the foregoing reasons, Defendants' Motion for Summary
Judgment is GRANTED and Plaintiff's Cross-Motion for Summary

                            24

Judgment is DENIED.   The Clerk shall enter judgment for

Defendants forthwith.


It is so ordered.

Ronald R. Lagueux
Senior United States District Judge
December   13   , 2006